Matter of Rosenbaum (2023 NY Slip Op 05608)

Matter of Rosenbaum

2023 NY Slip Op 05608

Decided on November 8, 2023

Appellate Division, Second Department

Per Curiam.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 8, 2023
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

HECTOR D. LASALLE, P.J.
MARK C. DILLON
COLLEEN D. DUFFY
BETSY BARROS
FRANCESCA E. CONNOLLY, JJ.

2021-08864

[*1]In the Matter of John Edward Rosenbaum, an attorney and counselor-at-law. (Attorney Registration No. 2772192)

The respondent was admitted to the Bar at a term of the Appellate Division of the Supreme Court in the Second Judicial Department on November 12, 1997. By order to show cause dated March 17, 2022, this Court directed the respondent to show cause why an order should not be made and entered pursuant to 22 NYCRR 1240.13 imposing discipline upon him for the misconduct underlying the discipline imposed by an order of the Supreme Court of the State of California filed May 17, 2021, and by an opinion of the District of Columbia Court of Appeals dated October 28, 2021, under the name John E. Rosenbaum, upon findings that he engaged in misconduct.

Diana Maxfield Kearse, Brooklyn, NY (Thomas J. Murphy of counsel), for the Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts.
Beckman & Associates, LLC, New York, NY (Bruce H. Beckmann), for respondent.

PER CURIAM.

OPINION & ORDER
By an opinion of the District of Columbia Court of Appeals dated October 28, 2021, the respondent was disbarred, with reinstatement conditioned on his payment of restitution in the sum of $100,000, with statutory interest. The District of Columbia Court of Appeals's disbarment was based on findings made after a five-day hearing held in September 2020.
After the September 2020 hearing but prior to the disbarment imposed in the District of Columbia, the respondent negotiated a disciplinary agreement in the State of California in December 2020, stipulating, inter alia, to certain facts and the disposition in his disciplinary matter, namely, his suspension from the practice of law. Thereafter, by order of the Supreme Court of the State of California filed May 17, 2021, the respondent was suspended from the practice of law for three years, execution of that period of suspension was stayed, and the respondent was placed on probation for three years subject to several conditions, including, among other things, that he be "suspended from the practice of law for a minimum of the first 18 months of probation," and that he remain suspended until he provides proof of his fitness, present learning, and ability to practice law.
The discipline imposed in both the District of Columbia and the State of California was based on the respondent's conduct as a fiduciary to the estate of Girard S. Petit (hereinafter the Estate), a Pennsylvania resident who died intestate. The respondent assisted Richard Denman, a friend who served as special counsel to the Estate, by agreeing to serve as a private fiduciary to the Estate and to distribute funds to Petit's heirs in France.
The respondent was admitted to the State Bar of California on June 14, 1995. He is not admitted to practice law in Pennsylvania. The respondent was admitted to the Bar of the District of Columbia Court of Appeals on February 6, 1998.
District of Columbia Discipline
Ad Hoc Hearing Committee Proceedings
On January 9, 2020, the District of Columbia Office of Disciplinary Counsel (DCODC) served the respondent with a Specification of Charges, and on March 10, 2020 the respondent filed an answer. The respondent twice sought to defer the proceedings due to, inter alia, the investigation in California based on the same underlying matter, but his requests were denied.
A hearing was held before the Ad Hoc Hearing Committee (hereinafter the Hearing Committee) on September 8, 2020, through September 11, 2020, and on September 14, 2020. The respondent was represented by counsel.
The Hearing Committee's Report
The Hearing Committee issued a 92-page Report and Recommendation (hereinafter the Hearing Committee Report) dated February 22, 2021, finding the relevant facts as follows:
On March 4, 2005, Gerard S. Petit died intestate in Hanover Township, Pennsylvania, with no next of kin in the United States. The Northampton County Court appointed Annette P. Landes, a Pennsylvania attorney, as the administrator of the Estate. Landes determined that she needed to hire a genealogical search firm to identify Petit's closest relatives. She contacted a firm named Archives Genealogiques Andriveau (hereinafter Andriveau) in France, but did not hire the firm because it charged a contingency fee on the Estate's beneficiaries, which is not permitted under Pennsylvania estate law. In 2009, Landes, with the assistance of a genealogical search firm, identified Petit's five closest next of kin, who were ultimately approved by the court: Marie Lions, Colette Veran, Etiennette Gardey, Raoul Lions, and Nicole Bezier. The heirs were elderly at the time of Petit's death, none of them spoke English, and they all lived in France.
In 2009, Marie Lions's grandson, Phillipe Farcy, contacted Landes. Farcy, who was a French native but lived in the United States, gathered documents from the heirs and engaged French attorneys.
In the fall of 2009, Landes received a letter from a French attorney representing Andriveau making a substantial claim against the heirs. In September 2011, upon Farcy's recommendation, Landes hired Denman as special counsel to the Estate. Upon Denman's advice, Landes recommended to the Northampton County Court that the Estate reserve $450,000 to deal with any claims made by Andriveau or other challengers. Landes was unsuccessful in identifying a bank willing to serve as fiduciary for the $450,000 reserve. Denman recommended the respondent, a long-standing friend, to serve as a private fiduciary for the reserved funds. The respondent represented to Landes that he had prior experience consistent with being a private fiduciary.
Pursuant to an escrow agreement that Denman drafted, Landes was required to transfer the Estate funds to Denman. An unnamed private fiduciary would manage the reserved funds, and the remaining funds would be paid to the heirs. The respondent was not a party to, nor identified in, the escrow agreement.
On December 27, 2011, Landes filed the first and final accounting of the Estate and on January 12, 2012, she filed a petition for adjudication and proposed distribution in the Northampton County Court. The court confirmed the final accounting and issued a Certificate of Confirmation authorizing distribution of the assets of the Estate such that $450,000 was to be reserved and $919,515.51 was to be disbursed to the five heirs. Of the Estate funds to be distributed, Marie Lions, Colette Veran, and Etiennette Gardey would each receive a one-quarter distribution of $229,878.88, and Raoul Lions and Nicole Bezier would each receive a one-eighth distribution of $114,939.44. The $450,000 reserve was to be held in escrow for up to three years in the event of any challenges to the Estate.
On February 9, 2012, Landes transferred a total of $1,369,515.51 in estate funds to Denman's IOLTA account in two separate wire transfers.
The respondent testified that he was advised that a proceeding in a Pennsylvania court had approved his role as a private fiduciary for the Estate.
On February 6, 2012, the respondent opened a Client Funds Checking Account, ending with 9829, with JPMorgan Chase Bank, N.A. (hereinafter the Chase Bank checking account). On February 13, 2012, rather than remit the $450,000 reserve, Denman transferred $858,000 by wire to the Client Funds checking account, representing the bulk of the Estate that was to be distributed [*2]to the heirs. Denman told the respondent that he was keeping the $450,000 reserve.
The amount that the respondent received was almost $62,000 less than the $919,515.51 that the Northampton County Court had ordered to be distributed. According to an email from Denman to the respondent on the date of the transfer, Denman was sending the respondent $858,000 and distributing the remaining $62,000 (which included sending a total of $27,000 to three of the heirs and $8,000 to the respondent personally). However, Denman did not send the $27,000 to the heirs.
On February 27 and 28, 2012, the respondent opened five Client Funds Savings Accounts (hereinafter the sub-accounts) at Chase Bank in the names of each of the heirs. The respondent deposited $858,000 as follows: $200,000 into the sub-accounts for each of the three heirs receiving a one-quarter share of the Estate (Marie Lions, Veran, and Gardey), and $100,000 into the sub-accounts for each of the two heirs receiving a one-eight share of the Estate (Raoul Lions and Bezier). The remaining $58,000 remained in the respondent's Chase Bank checking account. Each of the five sub-accounts was designated as belonging to the respective heir "by John Rosenbaum Attorney at Law Agent Escrow Account," and listed the name of the heir for whom the account was created and that heir's address in France. The respondent was the only person with authority to draw on the Chase Bank checking account and the five sub-accounts.
Over the course of 15 months (from March 2012 to mid-May 2013), the respondent disbursed some of the Estate funds to the heirs, virtually all of which were distributed in increments of $9,500. The respondent disbursed to Denman and to himself the bulk of the Estate assets. The Estate funds were used, inter alia, to pay for schooling for Denman's son, for a lavish trip that Denman and the respondent took to France, for travel by the respondent to New York, for fees incurred by Denman and the respondent for alleged legal work, and for Denman's and the respondent's personal expenses.
Starting in April 2012, the respondent's practice was to pay his legal fees out of the Estate assets after obtaining Denman's approval, in writing, and then signing a check to himself from the Chase Bank checking account. The respondent testified that even when he performed menial tasks, he billed the Estate at the rate of $400 per hour.
By May 20, 2013, the Chase Bank checking account had been depleted such that only $34,303.71 remained on deposit. At the same time, the heirs Gardey, Raol Lions, and Marie Lions each had approximately $500 in their sub-accounts; Bezier had $44,906.47 in her sub-account; and Veran had $88,782.22 in her sub-account.
On May 20, 2013, after Gardey, Marie and Raoul Lions, and Bezier filed a motion for a preliminary injunction, the Northampton County Court froze the Chase Bank sub-accounts holding Estate funds for those heirs as well as Denman's account. The court ordered Landes, Denman, and the respondent to show cause why the preliminary injunction should not be continued. Veran was the only heir who did not join the motion for preliminary injunction.
The respondent's counsel and Denman subsequently moved in the Northampton County Court to unfreeze Veran's sub-account. On June 28, 2013, the court granted the motion. On July 3, 2013, the respondent transferred virtually all of the funds remaining in Veran's sub-account, $88,789.01, to the respondent's personal checking account, which contained some of the respondent's personal funds. The same day that the respondent transferred Veran's funds to his personal checking account, the respondent withdrew $9,000, reportedly for Denman's legal fees, $5,000 for the respondent's legal fees, and $7,500 to pay Veran. Thereafter, the respondent and Denman spent all of the remaining Veran funds over the next two months. These expenditures included paying Denman's cable bill, making cash payments to Denman, sending Moneygrams and Western Union transfers to Denman in Italy, paying Denman's airfare to Poland, and purchasing a briefcase from Paris that cost over $9,000. The respondent paid Denman's expenses based on Denman's undocumented assurances that he had completed legal work on behalf of the Estate. Although, as part of the DCODC investigation, the respondent produced a ledger which documented more than 30 ATM withdrawals purportedly made by Denman, the bank records showed otherwise. All of the ATM withdrawals were made in the Bay Area of California where the respondent resided. By September 5, 2013, only approximately $2,000 of Veran's funds remained on deposit.
On March 12, 2014, the Northampton County Court found that Denman had unlawfully used $829,719.54 in Estate funds for his personal use. The court removed Denman's and the respondent's authority over the Estate, and made a preliminary injunction entered on May 20, 2013, permanent.
The Hearing Committee found that, of the $858,000 of the heirs' money that the respondent took control of on February 13, 2012, the respondent had transferred only $149,000 to the heirs and $75,000 to Farcy. At the conclusion of the litigation brought by the heirs, the respondent returned $170,741.63 pursuant to a court order.
The Hearing Committee found that the respondent violated the following Pennsylvania Rules of Professional Conduct (hereinafter PA RPC):
PA RPC 1.15(b)
The Hearing Committee found that the respondent's purported ignorance of Denman's fraudulent scheme was "contrived." Denman's fraud was "so pervasive that [r]espondent's blindness could only be considered willful." Even if the Hearing Committee were to credit the respondent's explanation that his fiduciary duty to the heirs was limited in that he was required to comply with Denman's instructions as long as they were "within the bounds of reason," the respondent violated his duty "when he complied with instructions well outside the bounds of reason."
The respondent claimed that had he known of the details of the Northampton County Court's distribution order, he would have followed them. The Hearing Committee found that as a fiduciary to the Estate, the respondent had a "responsibility to the Northampton County Court to learn of and follow its orders with respect to the money he held. . . . [A]s a fiduciary of these assets, Respondent had a duty to inform himself of the court's order. He cannot avoid his responsibility to preserve the assets of the Estate by actively avoiding knowledge of the Northampton County Court's order."
The respondent conceded that he had placed the Veran funds in his personal checking account, which at the time contained personal funds. The Hearing Committee noted that the bank records "are similarly unequivocal" and concluded that the respondent had engaged in commingling.
Additionally, the Hearing Committee found that the respondent's use of fiduciary funds "was at relevant times unauthorized and constituted misappropriation of funds." The Hearing Committee stated that it could not overlook, among other things, the following facts: the respondent is an attorney who was entrusted with the Estate funds; the respondent "initiated affirmative actions to spend down funds and obscure account activities from the owners of the Estate property"; "[n]o other party except Respondent had control of the Estate funds and, thus, no additional signature was required to move or disburse any Estate funds"; and the respondent never sought consent from any of the heirs prior to the disbursement of any funds, knowing at all relevant times that the Estate funds were not his property. The Hearing Committee further considered, among other things, that the respondent refused to provide accounting information to the heirs; made efforts to discontinue the remittance of bank statements to the heirs; refused to engage with the attorneys for the heirs; rapidly depleted the accounts; made numerous ATM withdrawals without memorialization; shuffled money amongst his accounts; took expensive trips with luxury accommodations; disbursed Estate funds to third parties "on dubious instructions without proper documentation"; and used Estate funds to pay personal medical bills. The Hearing Committee concluded that the respondent personally gained and benefitted from the funds entrusted to him.
Moreover, the Hearing Committee found that the respondent intentionally misappropriated fiduciary funds. The respondent repeatedly acted in his own interests at the expense of the heirs; he spent "large amounts of estate funds on excessive fees or needless expenses"; and he "intentionally continued to take money for himself." The respondent could not identify any mitigating factors that rose to "extraordinary circumstances sufficient to avoid a finding of intentional misappropriation."
The Hearing Committee did not find the respondent credible. It found the respondent's testimony "consistently evasive." The respondent blamed all of his actions on Denman, who had passed away in June 2019. The respondent testified that it was not his role to question the legal work that Denman was doing or to monitor Denman's activity; nor did the respondent believe that he owed an independent duty to the heirs. The respondent denied that he was a fiduciary, even though he had represented himself as such in writing, including in communications to the heirs and their representatives, and on the Chase Bank accounts. The Hearing Committee noted that the respondent could not explain why he disbursed Estate funds for "blatantly improper purposes, other than to say that [ ] Denman told him to do so." The Hearing Committee also found that the respondent had "no credible rationale" for not asking Denman for any time charges or proof that he had performed the legal services for which he was seeking compensation from entrusted funds.
The Hearing Committee did not rely upon character evidence submitted by the respondent, such as statements from personal friends who were not subject to cross-examination, as evidence that the respondent had not violated the Rules of Professional Conduct or find that such evidence mitigated the respondent's violations.
PA RPC 1.15(e)
The Hearing Committee found that the respondent had failed to promptly deliver funds and provide accounting for the Estate funds. The Hearing Committee noted that it was undisputed that "over the course of 15 months, Respondent delivered only $149,000 or approximately 17% of the funds held as fiduciary, to the five heirs. Likewise, it is undisputed that Respondent never provided an accounting of the funds he held as a fiduciary." Moreover, the Hearing Committee noted that the respondent "took efforts (and spent Estate funds) to prevent the heirs from receiving any accounting."
PA RPC 8.4(b)
The Hearing Committee stated that the respondent was charged by the DCODC with committing "a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects in violation of Rule 8.4(b)." Specifically, the DCODC alleged that the respondent had committed the criminal act of wire fraud in violation of 18 USC § 1343. The DCODC had the burden of proving by clear and convincing evidence that the respondent's conduct satisfied the elements of the wire fraud statute: (1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme; (3) and the specific intent to defraud. The Hearing Committee concluded that the DCODC had proven that the respondent committed wire fraud and, in turn, violated RPC 8.4(b). Ample evidence existed of a scheme to defraud and that emails and telephone calls were used to further the scheme. The Hearing Committee also found that the circumstantial evidence of an intent to defraud was "overwhelming." The respondent consistently refused to provide accountings and affirmatively cut off the distribution of bank statements to the heirs. The respondent also placed the Veran funds into his personal checking account and spent 91% of those funds. As to respondent's defense that he was an "unwitting participant" in an elaborate scheme devised by Denman, the Hearing Committee noted as follows: "To continue to profess ignorance in light of the blatant looting of entrusted funds is, itself, criminal."
PA RPC 8.4(a)
The Hearing Committee determined that for the same reasons that the respondent violated PA RPC 8.4(b), the respondent also had violated PA RPC 8.4(a), which provides that it is professional misconduct to "violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another."
PA RPC 8.4(c)
Pursuant to PA RPC 8.4(c), it is professional misconduct to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." According to the Hearing Committee Report, to establish a violation of PA RPC 8.4(c), there must be clear and convincing evidence that a false statement was made knowingly or with "reckless ignorance of the truth or falsity thereof," defined as "deliberate closing of one's eyes to the facts that one had a duty to see or stating as fact things of which one was ignorant." The Hearing Committee found that the respondent violated PA RPC 8.4(c) as he "took pains to ignore his responsibilities to the Northampton County Court and the heirs, [and] to willfully turn a blind eye to [ ] Denman's systematic looting of the Estate assets, his and repeated lies and half-truths to the heirs, [ ] Farcy, and others regarding [the respondent's] 'work' on behalf of the heirs."
PA RPC 8.4(d)
The Hearing Committee further found that the respondent's intentional acts were prejudicial to the administration of justice, in violation of PA RPC 8.4(d).
PA RPC 1.15(a)
The Hearing Committee also determined that the respondent violated PA RPC 1.15(a) by collecting an excessive fee. The respondent collected "approximately $100,000 in fees from the $858,000 to which he was entrusted, or over 11%. Considering that his only responsibility was to distribute this money to heirs of the Estate, this fee was excessive."
Recommendation
As reflected in District of Columbia precedent, the Hearing Committee noted that disbarment is the presumptive sanction for intentional or reckless misappropriations. The Hearing Committee determined that no unreasonable delay in the proceeding or prejudice to the respondent [*3]existed, and thus, found no mitigation. Other mitigating factors such as his character references, past good deeds, and the fact that at that time the respondent had no prior disciplinary history were "not sufficient to rebut the presumptive sanction of disbarment." Further, the Hearing Committee recommended that the respondent be ordered to pay restitution in the sum of $100,000, plus interest, as a condition of reinstatement.
District of Columbia Court of Appeals Board on Professional Responsibility Review
The respondent did not challenge the Hearing Committee's findings and recommendations, but he urged the District of Columbia Court of Appeals Board on Professional Responsibility (hereinafter the Board) to (1) find that the Hearing Committee erred in recommending against deferral pending the outcome of the California proceedings; (2) set aside the Hearing Committee's Report on that basis; and (3) wait for the District of Columbia Court of Appeals (hereinafter the DC Court of Appeals) to initiate reciprocal discipline proceedings. Counsel for the DCODC supported the Hearing Committee's findings and recommendations.
The Board's Report and Recommendation
On July 15, 2021, the Board issued its Report and Recommendation. The Board agreed with the Hearing Committee's findings of fact, conclusions of law, and recommended sanction, and adopted and incorporated its Report and Recommendation. The Board was unpersuaded by the respondent's arguments. The Board, therefore, recommended that the respondent be disbarred with reinstatement conditioned upon the restitution recommended in the Hearing Committee's Report and Recommendation.
District of Columbia Court of Appeals Order
On October 28, 2021, the District of Columbia Court of Appeals issued an order concluding that the record supported the Board's Report and Recommendation and disbarred the respondent from the practice of law. As a condition of his reinstatement, the respondent was ordered, inter alia, to pay restitution in the sum of $100,000, with statutory interest. The order noted that the respondent did not file exceptions to the Board's Report and Recommendation.
State of California Discipline
The Hearing Department of the State Bar Court of California (hereinafter the Hearing Department) in an order filed January 22, 2021, approved a stipulation filed in In the Matter of John Edward Rosenbaum, Case Number 14-O-04952, dated December 30, 2020, in which the respondent, his counsel, and counsel for the State Bar of California stipulated to certain facts, conclusions of law, and the disposition in the matter (hereinafter the stipulation).
The stipulation provides, in relevant part, that the respondent breached his duty as a fiduciary to preserve the Estate assets for the heirs and to distribute the Estate funds to the heirs, in willful violation of California Business and Professions Code § 6068(a). The stipulation also states that the respondent committed a grossly negligent act of moral turpitude in willful violation of California Business and Professions Code § 6106 through the following conduct:
"By only paying $123,500 to the heirs, who were unsophisticated, elderly and living in France thereby making it difficult, if not impossible for them to make any individual efforts to compel respondent to release the funds due to them from the estate, even though the court had ordered that the heirs were entitled to receive the entire $858,000 immediately; by paying $85,533.90 to himself; by using $35,098.51 for the benefit of himself and Denman; by paying $254,983.99 directly to or for the benefit of Denman; by failing to communicate with the heirs, including but not limited to warning them that the inheritance assets were being depleted to pay respondent and Denman; and by failing to provide an accounting to the heirs despite repeated requests for accounting."
It was also stipulated that the respondent breached his duty as a fiduciary to preserve the Estate assets and distribute them to the designated heir, Veran, in willful violation of California Business and Professions Code § 6068(a). The respondent also committed a grossly negligent act of moral turpitude in willful violation of California Business and Professions Code § 6106 through the following conduct:
"By transferring $88,789.01 of Veran's remaining funds, into [respondent's] Chase 4038 personal checking account; by paying only $7,545 to Veran, who was unsophisticated, elderly and living in France thereby making it difficult, if not impossible for her to make any individual effort to compel respondent to release the funds due to her from the estate; by paying $9,634.21 to himself; by paying the remaining $71,609.80 directly to or for the benefit of Denman; by failing to communicate with Veran including but not limited to warning her that the inheritance assets were being depleted to pay respondent and Denman; respondent thereby breached his fiduciary duty as fiduciary to preserve the [*4]estate assets and distribute them to the designated heir, Veran."
The stipulation further provides that the respondent willfully violated California Business & Professions Code § 6103:
"By transferring $88,789.01, of Veran's remaining funds, into [respondent's] Chase 4038 personal checking account, on July 3, 2013; by paying only $7,545.00 to Veran; by paying $9,634.21 to himself; by paying the remaining $71,609.80 directly to or for the benefit of Denman; when respondent knew the January 27, 2012 probate court order . . . required $228,878.88 — including the $88,789.01 which was in respondent's custody as of July 3, 2013, to be immediately distributed to heir, Veran, respondent disobeyed or violated an order of the court requiring respondent to do or forbear an act connected with or in the course of the respondent's profession, which the respondent knew was final and binding and which the respondent ought in good faith to do, in willful violation of Business & Professions Code section 6103."
The respondent stipulated to the following aggravating circumstances: multiple acts of wrongdoing; concealment; overreaching; refusal to account; significant harm to client, public or administration of justice; and highly vulnerable victims.
The respondent stipulated to the following mitigating circumstances: pre-filing of the stipulation; no prior disciplinary history; good character; and pro bono, volunteer, and community service.
In discussing the appropriate discipline, the stipulation states that the respondent was "grossly negligent" in failing to exercise due diligence to inform himself regarding his responsibilities. The respondent was entrusted with nearly $1 million, but failed to execute a written employment agreement, and failed to review any court orders or other documents that would inform him of his obligations regarding the funds entrusted to him. Furthermore, the stipulation states that the respondent "took advantage of a position of trust, as the fiduciary, to allocate the bulk of the inheritance funds for Denman's and his own benefit instead of fulfilling his duty as fiduciary to secure them for the heirs' benefit."
Balancing the seriousness of the misconduct against the mitigating and aggravating factors noted above, the respondent stipulated that an 18-month actual suspension was within the recommended discipline under Standard 2.11, Standards for Attorney Sanctions for Professional Misconduct, Title IV of the Rules of Procedure of the State Bar of California.
In the order filed January 22, 2021, the Honorable Dennis G. Saab of the State Bar Court, found the stipulation to be fair to the parties and that it adequately protected the public, and inter alia, approved the discipline recommended to the Supreme Court of California.
California Supreme Court Suspension Order
By order of the Supreme Court of California (hereinafter the California Supreme Court), filed May 17, 2021, the respondent was suspended from the practice of law for three years. Execution of the suspension period was stayed, and the respondent was placed on probation for three years on the following conditions: (1) that the respondent be suspended from the practice of law for a minimum of the first 18 months of probation, and that the respondent remain suspended until providing proof to the State Bar Court of "rehabilitation, fitness to practice and present learning and ability in the general law"; (2) the respondent complies with the other conditions of probation recommended by the Hearing Department of the State Bar Court in its Order Approving Stipulation filed on January 22, 2021; and (3) "at the expiration of the period of probation, if [the] [r]espondent has complied with all conditions of probation, the period of stayed suspension will be satisfied and that suspension will be terminated." The respondent was also ordered, inter alia, to take and pass the Multistate Professional Responsibility Examination.
New York Proceeding
By order to show cause dated March 17, 2022, this Court directed the respondent to show cause why an order should not be made and entered pursuant to 22 NYCRR 1240.13 imposing discipline upon him for the misconduct underlying the discipline imposed by the order of the Supreme Court of the State of California filed May 17, 2021, and the opinion of the DC Court of Appeals dated October 28, 2021. The Court directed that if the respondent asserts any of the defenses enumerated in 22 NYCRR 1240.13(b)(1) or (2), his affidavit must be supported by copies of the records of the proceedings held in the State of California and the District of Columbia.
In response to this Court's order to show cause, the respondent did not raise any defense under 22 NYCRR 1240.13(b), and did not contest the imposition of reciprocal discipline. [*5]The respondent argued, inter alia, that the State of California's 18-month suspension is consistent with New York precedent and should, thus, be the reciprocal discipline imposed by this Court. The respondent noted that his wrongful acts did not occur in the District of Columbia and argued that imposing the same discipline as the District of Columbia would be unjust. California, however, was where the respondent has resided since law school, where the respondent maintained the bank accounts for the heirs, and where all the relevant acts in the matter occurred. In a supplemental submission dated March 29, 2023, the respondent informed this Court that he is reinstated to the practice of law in California.
Findings and Conclusion
Based on the foregoing, we find that the imposition of reciprocal discipline is warranted based on the discipline imposed by the District of Columbia Court of Appeals and the California Supreme Court.
There is nothing in the record to suggest that the imposition of reciprocal discipline, as imposed by the District of Columbia and the State of California, would be unjust.
In determining the appropriate sanction, this Court has found that
"[i]n reciprocal proceedings, we generally accord significant weight to the sanction imposed by the jurisdiction where the misconduct occurred because the foreign jurisdiction has the greatest interest in fashioning sanctions for misconduct perpetrated therein. Therefore, when the sanction prescribed by the foreign jurisdiction is not inconsistent with the sanction for similar misconduct in this jurisdiction, the Court should impose the same sanction" (Matter of Sirkin, 77 AD3d 320, 323 [citations omitted]; see Matter of Esposito, 126 AD3d 93, 109).
However, when the sanction in the foreign jurisdiction "deviates substantially from this Court's precedent, we have departed from the general policy of deference and imposed a more severe penalty where warranted" (Matter of Munroe, 89 AD3d 1, 7; see Matter of Esposito, 126 AD3d at 109). Here, we agree with the conclusion of the Hearing Committee for the District of Columbia that the respondent's conduct "was outrageous, that he showed a callous disregard to the beneficiaries to whom he owed a fiduciary duty, and in fact, intentionally misappropriated funds that were intended for them. His actions, over the course of more than a year, demonstrate that he consistently abused the ethical standards of the legal profession."
Accordingly, based on the fully developed record from the District of Columbia and the stipulation the respondent entered into with the California State Bar, we find that the respondent's conduct warrants his disbarment, which is consistent with this Court's precedent (see Matter of Blatt, 217 AD3d 113; Matter of McMillan, 164 AD3d 59).
LASALLE, P.J., DILLON, DUFFY, BARROS and CONNOLLY, JJ., concur.
ORDERED that pursuant to 22 NYCRR 1240.13, the respondent, John Edward Rosenbaum, is disbarred, and his name is stricken from the roll of attorneys and counselors-at-law; and it is further,
ORDERED that the respondent, John Edward Rosenbaum, shall comply with the rules governing the conduct of disbarred or suspended attorneys (see id. § 1240.15); and it is further,
ORDERED that pursuant to Judiciary Law § 90, effective immediately, the respondent, John Edward Rosenbaum, shall desist and refrain from (1) practicing law in any form, either as principal or as agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,
ORDERED that if the respondent, John Edward Rosenbaum, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency, and the respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 1240.15(f).
ENTER:
Darrell M. Joseph
Acting Clerk of the Court